KEARSE, Circuit Judge,
dissenting in part:
I respectfully dissent from so much of the Majority Opinion as finds the evidence insufficient to support (1) the convictions of defendants Richard Shapiro and Martin Nissenbaum of conspiracy, in violation of 18 U.S.C. § 371, to (a) defraud the United States by impairing the lawful functions of an agency of the United States government, to wit, the Internal Revenue Service (“IRS”), (b) commit tax evasion, see 26 U.S.C. § 7201, and (c) make false statements to the IRS, see 18 U.S.C. § 1001 (Count One); and (2) those two defendants’ convictions of attempted tax evasion in violation of 26 U.S.C. § 7201 (Counts Two and Three).
As the Majority Opinion sets out, this prosecution focused principally on
the design, implementation, and audit defense of four tax shelters developed by the [Ernst & Young LLP (“E & Y”) ] VIPER Group/SISG: the (1) Contingent Deferred Swap (“CDS”); (2) Currency Options Bring Reward Alternatives (“COBRA”); (3) CDS Add-On (“Add-On”); and (4) Personal Investment Corporation (“PICO”) shelters.
Majority Opinion ante at 54. “The IRS can disallow deductions resulting from a transaction that ‘can not [sic] with reason be said to have purpose, substance, or utility apart from [its] anticipated tax consequences. Such transactions are said to lack “economic substance.” ’ ” Majority Opinion ante at 58 n. 15 (quoting, with alterations, Lee v. Commissioner, 155 F.3d 584, 586 (2d Cir.1998)).
Count One of the superseding indictment alleged that each of the above four tax shelters, along with one other, was fraudulent, and that Shapiro, Nissenbaum, and defendant Robert Coplan — each of whom was a lawyer with a Master’s Degree in tax law and decades of experience in tax practice — and other persons known and unknown, conspired and agreed to defraud the United States, to violate the federal income tax laws, and to make false statements to the IRS. As the Majority Opinion acknowledges, the evidence as to the conspiracy’s objectives is not deficient if there is sufficient evidence of at least one of the alleged objectives. See Majority Opinion ante at 62-63. “[T]he Government sought to demonstrate that the defendants hid the truth from the IRS by withholding information and making affirmative misstatements” about these shelters, Majority Opinion ante at 58, in IRS audit interviews and in connection with a 2000 IRS amnesty program that would allow a person who had invested in tax shelters, if the IRS deemed them not legitimate transactions, to avoid paying penalties on those transactions.
The Majority does not suggest that there was insufficient evidence for the jury to find that there existed a conspiracy with one or more of the objectives alleged in Count One. Nor could it, given that Co-plan and defendant Brian Vaughn, a certi- *97 fled public accountant and certified financial planner employed by E & Y, were convicted of participating in the alleged conspiracy and that we affirm those convictions. Rather, the Majority finds that the evidence was insufficient to show that Shapiro and Nissenbaum knew of the conspiracy and participated in it. See Majority Opinion ante at 62-63.
The Majority Opinion sets out the well established legal principles that “[i]n the context of a conspiracy conviction, ‘deference to the jury’s findings is especially important ... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court,’ ” Majority Opinion ante at 62 (quoting United States v. Rojas, 617 F.3d 669, 674 (2d Cir.2010)); that “ ‘the government is entitled to prove its case solely through circumstantial evidence,’ ” Majority Opinion ante at 69 (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir.2004)); and that “[i]n evaluating a sufficiency challenge, we ‘must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government’s favor, and deferring to the jury’s assessment of witness credibility and its assessment of the weight of the evidence.’ ” Majority Opinion ante at 62 (quoting United States v. Chavez, 549 F.3d 119, 124-25 (2d Cir.2008)). But in finding the evidence insufficient to permit the jury to infer that Shapiro and Nissenbaum knew of the conspiracy and participated in it, the Majority does not apply these principles.
A. The Conspiracy Count
E & Y, an accounting firm, had a Personal Financial Counseling group (“PFC”) that included a group, initially called VIPER — an acronym for Value Ideas Produce Extraordinary Results — and whose name was later changed to Strategic Individual Solutions Group (“SISG”) (see Government Exhibit (“GX”) 73), which marketed tax shelters (see Trial Transcript (“Tr.”), 4619, 1069). Coplan was the leader of this “high net worth market group” (Tr. 4619-20); Shapiro and Nissenbaum were core members (see, e.g., id. at 2135-37, 2236).
At trial, the government introduced numerous e-mails between or among Shapiro, Nissenbaum, and Coplan (and others) discussing, inter alia, the need to prevent certain materials, which mentioned E & Y clients’ interest in minimizing or eliminating taxes, from falling into the hands of the IRS. These included:
— GX 795 (Coplan e-mail dated November 27, 2000, with copies to Shapiro, among others, stating, “we refrain from sending out — or leaving with a client— promotional materials that go through the steps of a strategy, or even highlight the tax benefits of a strategy. Business purpose is a critical element to prove for these solutions, and the less evidence there is that the client responded to a tax-saving promotion, the better for his argument that there were non-tax motivations guiding his actions.” (emphasis added));
— GX 860 (Shapiro e-mail dated May 22, 2001, to Melinda Merk, a member of the PFC group who worked with SISG (see Tr. 1281), stating that “as a general rule, presentation materials SHOULD NOT be left with the client. Clients may take notes, etc., but materials should be handed back at the end of the meeting. In an audit meeting i [sic] had in Minneapolis on a COBRA transaction, one of the items requested of the taxpayer was any promotional materials that they had.” (capitalization in original));
*98 — GX 795 (Merk e-mail dated November 22, 2000, to an E & Y tax department employee stating “I am hesitant to prepare and provide any summary for delivery to a potential client, based on my recent conversations with Richard Shapiro and Bob Coplan that we be very careful about providing such information in writing for potential dissemination into the marketplace and/or receipt■ by the media, Treasury.... ” (emphases added)); — GX 555 (Coplan e-mail dated July 17, 2001, to some 60 E & Y employees, including Shapiro and Nissenbaum, “instruct[ing them] to immediately delete and dispose of any and all materials in [their] drawers and on [their] computers related to the COBRA transaction other than” opinion letters and documents related to the client’s currency trades and “documents supporting the economic purpose and bona fide nature of the investment in the transaction” (emphases added));
— GX 602 (Coplan e-mail dated July 23, 2001, to some 60 E & Y employees, including Shapiro and Nissenbaum, re “PICO Materials Leak,” stating that a potential client had sent a set of E & Y’s PICO materials to an E & Y competitor, and that although Coplan was “not suggesting that this is necessarily a calamitous event[, t]he potential negative repercussions are obvious, and a fax of the materials to certain people [including] the government WOULD have calamitous results ” (capitalization in original)(other emphasis added)); and
— GX 639 (Coplan e-mail dated June 14, 2000, to an E & Y regional senior manager, with a copy to Shapiro re “Final Set of CDS Add-On Slides,” stating, inter alia, that “[i]f these slides ever made their way to the IRS ... the entire business purpose argument that gives us the ability to distinguish this from COBRA would be out the window.” (emphases added)).
As discussed below in subparts 1-4 and Part B below, the government also presented testimony from many witnesses, including
— former E & Y tax partner Thomas A. Dougherty, who testified that, in the presence of Shapiro and others, he lied to the IRS in connection with the COBRA tax shelter, making false but “plausible” representations that he had discussed with Shapiro;
— former E & Y client Kathryn Munro, who testified to statements made— and statements not made — to her by E & Y in connection with investments in CDS and Add-On shelters, and with respect to false and misleading amnesty letters prepared by E & Y for submission to the IRS;
— former E & Y manager Jason Bryant Rydberg, who dealt with Munro and testified to, inter alia, the preparation of false and misleading opinion letters and letters to the IRS following its offer of amnesty with regard to CDS and Add-On tax shelters, and testified to the E & Y requirement that presentations with regard to those shelters be shown in advance to Shapiro;
— former E & Y manager Belle Six— who earned a total of some $22 million in commissions both from selling CDS shelters while at E & Y working with, among others, Shapiro, Coplan, and Nis-senbaum, and from selling E & Y Add-On shelters thereafter — who had pleaded guilty to conspiring to defraud the government and had been required to pay or forfeit that total to the government (see Tr. 2106-10); and
— former practicing lawyer Peter Cin-quegrani, who had pleaded guilty to, inter alia, conspiring with others to give *99 false statements and false documents to the IRS in connection with the PICO tax shelter, having collaborated with Shapiro in fashioning PICO opinion letters that Cinquegrani testified he knew contained false and misleading statements constituting a “cover story” (Tr. 4015).
1. Shapiro and COBRA
Shapiro was the E & Y leader on the national roll-out presentation of the COBRA tax shelter in 1999. {See Tr. 4588.) Dougherty testified principally about the professed — and purported — interests of three members of a partnership called WRB Lake who invested in a COBRA tax shelter. Dougherty had been instructed by E & Y’s tax division director to ask two of those partners — E & Y clients Bill Wanner and Brian Sullivan, whose business was water purification and desalinization and who were selling a company at a profit of more than $20 million each — whether they were interested in E & Y’s CDS strategy (see id. at 1081-86) to convert their ordinary income, which would have been taxable at about a 40% rate, into long-term capital gains, which would be taxable at 20% (see generally id. at 2149). However, Wanner and Sullivan, along with another WRB Lake partner, informed Dougherty that they were interested instead in a strategy whereby taxes on their transaction would be not just minimized but “eliminate[d].” (Id. at 1087.) After E & Y decided to market COBRA, its tax elimination strategy (see id. at 1088-89), the WRB Lake partners sought “to enter into a COBRA transaction ... for the purpose of eliminating tax on the transaction they were going through”; the clients said they “w[ere] interested in pursuing [COBRA] for that purpose” (id. at 1183), and in 1999 they did so. From the outset, Wanner had stated his “desire to enter into the COBRA transaction for purposes of creating a tax loss.” (Id. at 1141.)
In mid-March 2001, Sullivan received notice from the IRS that the WRB Lake partnership was being audited. He so informed Dougherty, who in turn informed Coplan by e-mail and fax, which Coplan forwarded to, among others, Shapiro, Nis-senbaum, and Denis Conlon (see Tr. 1171-75), a member of E & Y’s national tax practice whose specialty was responding to contacts from the IRS (see GX 540; Tr. 1175-76). In a conference call in early April, Dougherty discussed with Coplan and Conlon the “facts that could hurt the client’s [sic ] case” (Tr. 1186). Dougherty, Coplan, and Conlon “tr[ied] to ... come up with some ideas that may he presented to the [IRS] agent for why the[]” WRB Lake partners entered the COBRA transaction (id. at 1182 (emphases added)), even though Dougherty, Coplan, and Conlon “knew that this was a COBRA transaction, one all three principals had entered into ... to realize the tax savings” (id. at 1181). Dougherty testified:
At this point of the discussion, we’re looking at other reasons that the taxpayers came together for the purposes of why did they purchase foreign digital contracts, why did they do this together in a partnership, and why did they decide to terminate that partnership and not do any more foreign currency investing.
(Id.) Dougherty advanced various possible explanations, including that Wanner had had some prior experience, in his business, of doing some foreign currency trading, and “maybe that was something we could throw out as being the fact supporting a reason for entering into this transaction ” (id. at 1182 (emphasis added)), although Wanner had not indicated to Dougherty any such motivation (see id. at 1181-83). Dougherty “also talked about the fact that the three [WRB Lake partners] happened to be joint investors in [a] newly formed *100 company,” which could explain why “they would be willing to form a partnership together and carry on some partnership investment activities. Maybe that would be something we could use” {Id. at 1182 (emphasis added).) Dougherty had already told Coplan and Conlon “the real history behind these clients; that is, how they came to Ernst & Young and the COBRA transaction.” {Id. at 1736.) “They knew those facts about the three clients.” {Id. at 1738.) “We were talking about plausible reasons that could be presented”; “we needed to come up with some business reasons why the transaction took place in the form it took place.” {Id. at 1740 (emphases added).)
After that conference call among Dough-erty, Coplan, and Conlon, Conlon sent Dougherty and Coplan an e-mail dated April 19, 2001, stating that they needed to have Shapiro join the thinking {see GX 542 (“I think we need Richard.... I want to state our case clearly and correctly from the beginning.... IRS would like to catch us cold and get admissions that will hurt our case. We need to make sure that does not happen.”)). Accordingly, on April 20, 2001, Coplan e-mailed Dougherty, Conlon, and Shapiro to schedule a conference “call with all of us ... to go over the facts of this case and plan how we will approach the agents on this matter.” (Tr. 1188.)
In late April, a conference call was held among Dougherty, Coplan, Conlon, and Shapiro. During that call, Shapiro raised the question of business purpose {see Tr. 1741-42), saying “[w]e need to discuss business purpose on this transaction” {id. at 1191). Dougherty, however, “[h]ad” already “told Mr. Shapiro at that point the real facts about how these clients had come to Ernst & Young for the COBRA transaction.” {Id. at 1741 (emphasis added).) The reason Dougherty, Coplan, Con-lon, and Shapiro were “discussing business purpose” was the “same reason” that Dougherty, Coplan, and Conlon had discussed possible business purposes in their earlier call: they needed “to talk about the other reasons, plausible reasons, that could be discussed ... should it become important to discuss that at the meeting with the agent.” {Id. (emphases added).)
Dougherty testified that in the ensuing May 17, 2001 IRS interview, attended by Dougherty, Conlon, and Shapiro, Dougherty “lied” to the IRS agent “about why the three [WRB Lake partners] got into the COBRA transactions.” (Tr. 1743.) Dougherty gave the agent “the plausible reasons that we had talked about during the discussions, which were misleading the agent as to the real pwpose.” {Id. at 1743-44 (emphases added).) Dougherty testified that the “[statements [he] made to the agent about why the clients had done this, were ... things [he] had gone over during the calls with Mr. Coplan, Mr. Conlon, and Mr. Shapiro.” {Id. at 1743 (emphasis added).)
From this series of events alone, the jury could permissibly find that, with respect to COBRA, Shapiro knowingly joined and participated in the conspiracy with Coplan and others to impair the lawful functions of the IRS and to make false statements to the IRS.
2. Shapiro and CDS and CDS Add-On
In addition, Shapiro was E & Y’s “subject matter expert” — or “SME” — on its CDS strategy (Tr. 4555), which would convert high ordinary income into long-term capital gains (taxable at about half the rate of such ordinary income), and on the Add-On strategy {see GX 636), which, when used in the second year of a CDS transaction, would involve the creation and liquidation of an LLC and eliminate even the capital gains. The SME had the “technical expertise” (Tr. 4876), i.e., he “was the *101 person that knew the transaction the best and that’s who you went to for the questions” (id. at 4555) and “for approval” (id). For example, a regional senior manager sent an e-mail to Shapiro forwarding a Power Point presentation to Shapiro “for approval as the CDS SME.” (GX 30, dated October 22, 1999.) And in response to a Power Point presentation proposed by Vaughn for Add-On, Coplan stated that “the Add-On strategy will lose all of its ‘business purpose’ if it is reduced to steps in a PowerPoint slide. The tax objective will appear to be the driving force” (GX 636 (Coplan e-mail dated June 14, 2000, to Vaughn, with a copy to Shapiro)); Coplan recommended not using slides and recommended that all “materials like this” should be reviewed in advance by Shapiro, as the Add-On “SME” (id.).
Success of the CDS shelter — involving a partnership that was to engage in swap transactions purportedly having a term of 18 months — depended on the swap’s termination after one year but short of the 18-month stated termination date. One year was the dividing line between short-term capital gains and long-term capital gains; termination prior to the end of the stated 18-month term was required for gains to be treated as capital gains rather than ordinary income. (See, e.g., Tr. 2198-99.) Shapiro repeatedly urged that the fact that early termination was pre-planned not be disclosed. On February 8, 2000, he sent an e-mail to Merk, with copies to Nissenb-aum, Coplan, and Vaughn, on “the [CDS] action plan”; in addition to suggesting that he, Shapiro, along with Coplan or Vaughn, should be involved in any CDS sales contact, Shapiro noted “the fact that our swap will be terminated early ” — and noted that this was “[cjlearly ... necessary for the flow of the transaction” — and he “questioned] ... seriously” whether there “should ... be a document in existence ... that has all chapters and verses laid out.” (GX 66 (emphases added).) Shapiro added that “[t]he fact that no materials are to be left behind at a sales call is not enough. In my opinion, before anything is in ‘stone’ here, we should consider what are [sic] record will/should look like.” (Id. (emphasis added).) And in an e-mail to Vaughn about “cds models,” with copies to Nissenbaum, Coplan, and others, Shapiro instructed that certain “deletions” from the model documents were “essential,” and that the statements that “ ‘Calculations assume utilization of the Early Termination Provision ... ’ should be deleted.” (GX 100, dated April 14, 2000.)
Bolton Capital Planning (“Bolton” or “BCP”) was the general partner in some LLPs created for CDS shelters. (See, e.g., Tr. 2215-16, 2477; GX 1231.) After Bolton received an inquiry from the IRS with regard to a CDS shelter, Coplan revised the language of the initial draft of the BCP response to the IRS inquiry to state that “[i]f the general partner, based on market fluctuations, terminates the swap contracts early, capital gain would arise on such termination” (GX 412 (Coplan e-mail dated January 18, 2001 (emphasis added))). Six testified that this “does not” (Tr. 2321) “accurately describe what ... clients” were “told ... about early termination and how the decision was made to early terminate” the CDS swaps (id. at 2320). The decision was not to be made based on market fluctuations; the “understanding ” was “[t]hat we assumed we would terminate, early terminate ... if the counter-party did not.” (Id. at 2321 (emphases added).) The revised language in GX 412 had been introduced the previous day in an e-mail from Coplan to Shapiro, Nissenb-aum, and others, with the statement that “This one should be more acceptable to Richard.” (GX 932, dated January 17, 2001; see Tr. 2318-22.)
*102 Consistent with Shapiro’s observation that “early” termination was necessary for success of the CDS strategy but should not be so described, former E & Y client Munro testified that when she and her husband had invested in a CDS shelter, they were not told that the swap had a duration of 18 months. They were simply told it would last a year. (See Tr. 3548; see also id. at 4564 (Rydberg testifying that “the maturity date of the swap that[ was] used in the CDS transaction” was 18 months; “[w]e told [clients] it would last 12 months and a day to the early termination date”); id. at 4537 (“all the CDS transactions ha[d] the same ... early termination date” of “12 months and one day”).)
Munro also testified that the “purpose of [the Munros’ CDS] transaction was to defer [their] tax liability until [they] sold” shares that her husband had received from the exercise of stock options “and could pay the capital gains tax.” (Tr. 3539; see also id. at 3525, 3530-32.) In 1999 with respect to CDS and in 2001 with respect to Add-On, Rydberg sent the Munros “representation letter[s]” to sign and return in order to receive opinions from a law firm as to the legitimacy of their investments in CDS and Add-On. (Id. at 3519-24, 4637-38.) Munro testified that these were letters that she did “[n]ot really” read before signing (id. at 3524), having “paid a lot of money to Ernst & Young for tax advice” (id. at 3526; see, e.g., id. at 4581 (Rydberg testifying that he told clients “the fee[ ] for th[e CDS] transaction ... was 4 percent of the loss that was being generated”); id. at 3512 (the Munros, for their CDS transaction, paid E & Y $400,000)). Munro testified that the representation letters were false and misleading in that they misstated the purpose for which she and her husband had invested in CDS and Add-On; and the opinion letters received by the Munros — who did not deal with the opining law firm except through E & Y— repeated those misstatements. (See id. at 3524-41.)
Munro testified that, contrary to the E & Y drafted representation letters, “[w]e did not invest in [the partnership] as a sound financial investment. We invested in it so we could pay less in taxes. That was the basic purpose of the transaction.” (Tr. 3525.) Contrary to the representation letters, “[i]t wasn’t a sound coherent business strategy. It was a specific transaction to help us reduce our taxes”; nobody “from Ernst & Young talk[ed] to [Munro] about a coherent business philosophy in connection with the CDS transaction.” (Id.) Contrary to the opinion letters— which were based on the representation letters — the CDS in fact “had a predetermined outcome ... and the outcome was the conversion of ordinary income to capital gains income. And that’s what the purpose of the transaction was about.” (Id. at 3530-31.) Contrary to the opinion letters, the partnership formed by Munro and her husband for the CDS had no “overall business plan”; “[t]he plan of the partnership was to convert ordinary income that you had by exercising your options and convert it to capital gain. So pay less in taxes was the primary purpose of the partnership.” (Id. at 3531-32.)
In 2002, Rydberg informed Munro of the IRS’s amnesty program, and E & Y drafted amnesty letters for Munro and her husband with respect to CDS and Add-On, which were signed by the Munros and were submitted to the IRS. (See Tr. 3545-46, 3550.) Munro testified that those amnesty letters — which were based on the opinion letters and (a) described business purposes that the Munros did not have, (b) did not mention the Munros’ purpose of reducing taxes, and (c) stated that the letters did not omit any material facts (see id. at 3546 (describing GX 1231 as pertaining to CDS and GX 1232 as pertaining to *103 Add-On)) — were false and misleading (see Tr. 3544-50).
The Munros’ amnesty letters to the IRS, submitted in March 2002, had been drafted by Rydberg. Rydberg testified that his draft for Add-On followed a template received from Coplan. (See, e.g., Tr. 4657-58; GX 491.) Drafts of that template had been e-mailed by Coplan to, among others, Shapiro and Nissenbaum on February 27, 2002 (see GX 490), and on March 5, 2002 (see GX 491). In the latter e-mail, Coplan stated “Please look this over to see if there are any changes you would make either to avoid unnecessary facts or to make it easier to complete accurately. I want to post this and distribute this morning. I will be sending along the CDS template later this morning....” (Id.) Nissenbaum responded to Coplan, with a copy to Shapiro, that, other than believing details as to the specific option trades to be unnecessary, “[t]he disclosure looks fine to me” (id.; see Tr. 4663); and Shapiro provided some non-substantive comments that were adopted (see Tr. 4663-65; compare GX 491 with GX 492). But “[tjhroughout these various drafts of the generic add-on amnesty template, ... the basic description of the transaction remain[ed] the same” (id. at 4665); and those drafts omitted mention of tax-minimization or tax-elimination purposes (see GX 490, 491).
Although the Add-On strategy for CDS was the brainchild of Vaughn (see Tr. 2378-79), Add-On was in reality a combination of CDS and COBRA (see id. at 1378-81). Both of the latter were shelters promoted to E & Y by Shapiro (see id. at 2144-46 (CDS); id. at 4588 (COBRA)), and Shapiro was the SME for Add-On (see GX 636). Vaughn, in a June 9, 2000 e-mail to numerous E & Y tax department employees, with copies to Shapiro, Coplan, and Nissenbaum, noted that “[w]ith the add-on feature, CDS can now be applied to capital gain situations,” and stated that “the 1999 and 2000 clients that have completed a CDS transaction” would shortly be “notified] ... of the opportunity to participate in the new trading program.” (GX 633.) Shapiro responded: “i [sic] remain concerned of the formal pre-wired tie-in to cobra, i [sic] think it adversely impacts the story that we can tell regarding the purpose of the transaction.” (Id. (emphasis added).) Coplan then edited the letter to be sent to clients announcing Add-On and, in an e-mail dated July 1, 2000, to Shapiro, Vaughn, Six, Merk, and Nissenb-aum, stated, “I softened the last reference to the liquidation of the interest in the LLC so it sounds less like an event that we know will happen in the near future.” (GX 144 (emphases added).) However, LLC liquidation was part of the eighth of 13 specified steps that were necessary for the success of an Add-On transaction. (See GX 115 (Vaughn e-mail dated May 18, 2000, to Coplan and Shapiro).) As Six testified, “liquidation of the interest in the LLC” in fact “was one of the steps that was required to obtain the tax benefits.” (Tr. 2410.)
3. Shapiro and PICO
The PICO (or Personal Investment Corporation) tax shelter was a tax deferral and conversion strategy that involved investments in an S corporation, called PICO, by the taxpayer and another shareholder. The PICO would engage in straddle transactions that generated offsetting gains and losses, with only the losses allocated to the taxpayer. These capital losses could be used by the taxpayer to offset his capital gains from unrelated sources. (See Tr. 3736.)
Cinquegrani, in early 2000, was an attorney who was approached, for an opinion letter, by the person who had conceived of PICO and who instructed Cinquegrani to *104 contact Richard Shapiro, E & Y’s lead contact for PICO. (See Tr. 3739^42.) In Cinquegrani’s initial conversation with Shapiro, there was no discussion of any business purpose or non-tax reason for PICO. (See id. at 3743-44.)
Cinquegrani proceeded to have legal issues researched, and he kept Shapiro informed of the results. (See, e.g., Tr. 3748-49.) He had many conversations with Shapiro, “discussing] various provisions of the Internal Revenue Code that may apply to the transaction, and [Shapiro] asked about what issues were or were not being included in the opinion” (id. at 3773); and Cin-quegrani sent memoranda and drafts to Shapiro, who forwarded them to Coplan and Nissenbaum (see id. at 3751-54, 3769-70). Cinquegrani sent summaries of the conclusions to be included in the requested opinion letter, and drafts of proposed fact sections — based on “assumed” facts, as there were no PICO clients at the time (id. at 3752-53) — to support the already-reached legal conclusions (see id. at 3750-54; id. at 3761 (“by the time [Cinquegrani] drafted [this] facts section,” the PICO opinion letter “was largely in its final form”).)
After receiving Cinquegrani’s draft of the fact section, Shapiro sent Cinquegrani an e-mail listing economic-substance representations that had been made in connection with a different transaction, stating that he was sending them for discussion purposes “as to tone, etc., not specifically for content.” (GX 653 (Shapiro e-mail dated August 7, 2000 (bold in original)).) Shapiro’s first four sample representations referred to “substantial non-tax” business purposes for the transaction; and the last stated that “[i]nvestor has reviewed the description of the transactions contained in the Letter and such description is accurate and complete, and there are no pertinent facts relating to the Transactions that have not been set forth in such description”; but Shapiro’s samples said nothing about the transaction’s tax ramifications. (Id.) Cinquegrani testified that he added some of Shapiro’s sample representations to the ensuing version of the PICO opinion (see Tr. 3777); the substance of two Shapiro samples asserting non-tax business purposes appeared as client representations in Cinquegrani’s opinion letter (see, e.g., GX 663).
Cinquegrani testified that he knew he was drafting a document that was misleading as to the true purpose of the PICO transaction and that he was engaged in wrongdoing. (See Tr. 3761.) For example, the fact description began by stating that the LLC “is offering qualified investors (‘the investors’) the opportunity to create a special purpose investment management company to capitalize on [the LLC’s] expertise in the foreign exchange markets and general investment management services”; Cinquegrani testified that that was not an accurate statement because “the real reason for offering this vehicle, which is the PICO, is to provide tax losses for investors.” (Id. at 3754-56.) The description contained other false or misleading statements as well (see id. at 3756-61), because although PICO was designed “[t]o make available to the investor significant losses” (id. at 3758), Cinquegra-ni’s “intention was to describe the transaction as much as possible as an ordinary business deal and to downplay all the tax aspects” (id. at 3756), “deemphasizing wherever possible tax benefits” (id. at 3760). No one at E & Y expressed any concerns about the language of the letter. (See id. at 3761.)
In sum, Cinquegrani testified that there was a “cover story element to the beginning of the opinion that misleads about what the transaction is all about” (Tr. 4015) and that the opinion letter contained *105 statements that were false and misleading (see id. at 3754-81), indeed, “wildly misleading” (id. at 3779). Cinquegrani was asked why he did not tell “Shapiro” and others that the opinion letter contained a false cover story. (Id. at 4021.) Cinqueg-rani testified that he “didn’t feel a need to say, oh, by the way, the stuff we are writing doesn’t really reflect what’s really going on,” because “the key players, that you mentioned, Mr. Shapiro [and others], they all participated in creating the story.” (Tr. 4021-22.)
4. Nissenbaum
Nissenbaum too was a core member of the SISG Group headed by Coplan. (See Tr. 2135-37, 2236.) I disagree with the Majority’s view that the evidence was insufficient to permit a reasonable inference that Nissenbaum knew of and participated in the conspiracy to impede the IRS in the performance of its lawful functions.
As the above discussion of Shapiro reveals, Nissenbaum too received numerous e-mails from Coplan, as well as several from Shapiro, urging concealment of facts that were material to the tax-minimization or tax-elimination goals of the COBRA, CDS, Add-On, and PICO shelters.
These included:
— Coplan’s July 17, 2001 e-mail, GX 555, ordering retention of documents “supporting the economic purpose and bona fide nature of the investment in the [COBRA] transaction” (emphasis added), along with legal opinions and documents relating to the currency trades, but ordering the immediate deletion and disposition of any other materials related to COBRA;
— Coplan’s July 23, 2001 e-mail, GX 602, about a “PICO Materials Leak,” stressing that leaking “of the materials to ... the government WOULD have calamitous results”;
— Shapiro’s February 8, 2000 e-mail on CDS, GX 66, “seriously” “ques-tionfing]” whether the “[c]learly ... necessary” “fact that our swap will be terminated early” should be included in “a document”;
— Shapiro’s April 14, 2000 e-mail on CDS, GX 100, terming it “essential” that the statements that “ ‘Calculations assume utilization of the Early Termination Provision’ ” “be deleted” from the model documents;
— Coplan’s July 1, 2000 e-mail, GX 144, stating — despite the fact that liquidation of the interest in the LLC was in fact a step that was required in order to achieve the planned tax benefits — that Coplan had “softened the” Add-On announcement letters’ “reference to the liquidation of the interest in the LLC so it sounds less like an event that we know will happen in the near future.”
I see nothing that required the jury to regard Nissenbaum as a disinterested recipient of random e-mails. These were communications sent to him as a core member of the SISG group, which prepared presentations, prepared templates for letters to and for clients, and prepared templates for responses to IRS inquiries. Plainly Nissenbaum did review e-mails sent to him with regard to letters to be sent to the IRS in seeking amnesty. With regard to PICO, Dougherty testified that he prepared a disclosure letter using an “amnesty template ... coming from Mr. Nissenbaum” (Tr. 1761; see id. at 1317-18); and that template did not “disclos[e] all the [taxpayer’s] motives” for entering into the transaction (id. at 1762) and did not “mention the primary motivation of deferring and reducing taxes” (id. at 1761). Nissenbaum approved the letter (prepared from his template) without substantive change as “Good to go” (GX 583 (Nissenb-aum e-mail dated April 18, 2002); see also *106 Tr. 1641). With regard to Add-On, Co-plan solicited — and received — comments from Nissenbaum on the proposed amnesty template (which adopted misstatements in the opinion letters received by E & Y clients, the opinion letters, in turn, having been prepared from the form representation letters for the clients (see, e.g., GX 786 (e-mail dated March 30, 2001, from Brent Clifton, attorney who wrote Add-On opinion letters, to Shapiro, Coplan, and Nis-senbaum); Tr. 2486-88)). The amnesty letter templates did not disclose the taxpayer’s actual motive, ie., tax-elimination. Nissenbaum’s only suggestion was to eliminate some investment details; otherwise, he said, “[t]he disclosure looks fine to me” (GX 491 (Nissenbaum e-mail dated March 5, 2002, to Coplan and Shapiro); see Tr. 4663).
Nor can it reasonably be argued that Nissenbaum did not realize the import of any of these nondisclosures. In March 2000, when he became aware that a regional E & Y tax department employee had sent to some 18 other tax department employees a Power Point presentation describing an SISG tax shelter, Nissenbaum instructed the director of that region to “make it clear” that “nothing from SISG is to be circulated this widely” (GX 94 (Nissenbaum e-mail dated March 22, 2000 (bold in original))). Nissenbaum stated, “This could shut this down sooner than sending the PowerPoint to the IRS!” (Id.)

B. The Convictions of Shapiro and Nis-senbaum on Counts Two and Three

Counts Two and Three of the superseding indictment charged Shapiro and Nis-senbaum with substantive offenses, to wit, attempted tax evasion in violation of 26 U.S.C. §-7201 in connection with the Add-On tax shelter. Section 7201 prohibits “any conduct, the likely effect of which would be to mislead or to conceal,” Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943). The jury was instructed, inter alia, that it could find defendants guilty of these substantive offenses on the basis of the principle established in Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that when the evidence establishes that a conspiracy existed, a member of the conspiracy may be held liable for all acts of wrongdoing performed by other coconspir-ators during the course of and in furtherance of the conspiracy, see id. at 646-47, 66 S.Ct. 1180.
Coplan and Vaughn were convicted of the conspiracy alleged in Count One and of the substantive tax evasion offenses alleged in Counts Two and Three. Given the evidence that supports the convictions of Shapiro and Nissenbaum of the Count One conspiracy, discussed in Part A above, the jury could easily find that the tax evasions by Coplan and Vaughn were in furtherance of the conspiracy and were foreseeable to Shapiro and Nissenbaum. I would thus uphold the verdicts against Shapiro and Nissenbaum on Counts Two and Three on the Pinkerton theory.
The Majority rejects the applicability of the Pinkerton theory “[f]or substantially the reasons that” the Majority would reverse the convictions of Shapiro and Nis-senbaum for conspiracy, Majority Opinion ante at 72. That is, the Majority views the evidence as insufficient to permit the inference that Shapiro and Nissenbaum knew of and participated in the Count One conspiracy, ie., that they were in fact members of the conspiracy.
In my view, the evidence discussed in Part A above was ample to permit the jury to infer that Shapiro and Nissenbaum knew of and participated in the proven conspiracy. Each was a core member of SISG, the tax-shelter-marketing arm of E & Y; they received numerous e-mails, *107 principally from Coplan, cautioning against allowing E & Y materials marketing those shelters to fall into the hands of “the IRS.” And similar warnings were explicitly issued by Shapiro and Nissenbaum themselves. The numerous warnings and stated goal to maintain sanitized files need not themselves have been unlawful in order to show, as they did, that Shapiro and Nis-senbaum were fully aware of the efforts to conceal the tax purposes of these shelters from the IRS. And the evidence was sufficient to permit the jury to infer that Shapiro and Nissenbaum engaged in misleading conduct that was plainly unlawful. Shapiro, for example, not only discussed with Dougherty false statements that they could proffer to the IRS in connection with the audit of the WRB Lake partners but also attended the IRS interview at which Dougherty told such “lie[s].” And both Shapiro and Nissenbaum reviewed and approved form letters to be submitted by E & Y clients to the IRS, in support of amnesty, that proffered business purposes, did not disclose the tax-reduction or tax-elimination motivation, and stated that no pertinent facts were undisclosed. In sum, I conclude that the evidence was sufficient to support the convictions of Shapiro and Nissenbaum of conspiracy as charged in Count One and of the substantive offenses charged in Counts Two and Three.
APPENDIX A
[[Image here]]
*108 APPENDIX B
RELEVANT STATUTORY PROVISIONS
18 U.S.C. § 371 — Conspiracy to Commit Offense or to Defraud United States
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.
26 U.S.C. § 7201 — Attempt to Evade or Defeat Tax
Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.
26 U.S.C. § 7212 — Attempts to Interfere with Administration of Internal Revenue Laws

(a) Corrupt or forcible interference

Whoever corruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both, except that if the offense is committed only by threats of force, the person convicted thereof shall be fined not more than $3,000, or imprisoned not more than 1 year, or both. The term “threats of force”, as used in this subsection, means threats of bodily harm to the officer or employee of the United States or to a member of his family.

(b) Forcible rescue of seized property

Any person who forcibly rescues or causes to be rescued any property after it shall have been seized under this title, or shall attempt or endeavor so to do, shall, excepting in cases otherwise provided for, for every such offense, be fined not more than $500, or not more than double the value of the property so rescued, whichever is the greater, or be imprisoned not more than 2 years.
18 U.S.C. § 1001 — Statements or Entries Generally
(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent statement or representation; or
(3) makes or uses any false writing or document knowing the same to contain *109 any materially false, fictitious, or fraudulent statement or entry;
shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.
(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party’s counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.
(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to—
(1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or
(2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.