**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James CARBULLIDO, Defendant–
Appellant.**

No. 01–10578.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 13, 2002.

Filed Oct. 1, 2002.

Daniel G. Bogden, United States Attorney, Kurt P. Schulke, Chief, Criminal Division & Organized Crime Strike Force, Kathleen Bliss, Assistant United States Attorney, Las Vegas, NV, for the plaintiff-appellee.

Franny A. Forsman, Federal Public Defender, John C. Lambrose, Assistant Federal Public Defender, Michael K. Powell, Assistant Federal Public Defender, Cynthia S. Hahn, Research & Writing Attorney, Las Vegas, NV, for the defendant-appellant.

Before: KOZINSKI and McKEOWN, Circuit Judges, and FITZGERALD,* District Judge.

McKEOWN, Circuit Judge.

We consider here the application of issue preclusion in the double jeopardy context based on a judge's findings as opposed to a jury verdict. According to a stipulation before the district court, James Carbullido was involved in a series of arsons over an approximately one-year period. After indictment for one of the arsons, he was found not guilty by reason of insanity in a bench trial. Through an unusual and unexpected combination of circumstances, it turned out that he was never committed, but was unconditionally released. As a consequence, the government sought a second indictment against him for another fire during the same one-year period. This case arises from the second prosecution of Carbullido. Carbullido argued that relitigation of the issue of his sanity was precluded by the earlier adjudication. The district court denied his motion to dismiss the indictment and he filed this interlocutory appeal. We reverse.

* The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

## BACKGROUND

According to the stipulation of facts filed in the first prosecution, Carbullido voluntarily met with agents of the Bureau of Alcohol, Tobacco, and Firearms in June 1999. He explained that he had been burning and vandalizing Church of Jesus Christ of Latter-day Saints ("Mormon") properties, because the Mormons had planted an electrical device in his brain, projecting voices into his head and taking control of his mind and body. The vandalism and fires were attempts to "push back." The stipulation lists nine arsons or attempted arsons of Mormon properties, the first in July 1998, and the last in June 1999.[1]

Carbullido was indicted for the July 1998 attempted arson with use of a firearm. Two defense psychologists and one prosecution psychiatrist examined him and agreed that he did not understand the wrongfulness of his criminal acts. The defense psychologists diagnosed Carbullido as suffering from "schizophrenia, paranoid type, continuous." They went on to conclude:

Mr. Carbullido's records and clinical interview are consistent in describing a person who has been suffering a severe mental illness for about the past 10 years, if his own estimate is correct. It is believable that Mr. Carbullido has committed the crimes for which he has been charged in his irrational attempt to fight back against voices in his mind that he experiences and which terrify him. He impresses me as believing, to the bottom of his heart, that there is in fact a conspiracy of Mormons who are attempting to control his life and the lives of others.

It is my opinion therefore that Mr. Carbullido did not possess the cognitive ability to understand his act of attempt-ed arson on the LDS church with the use of a destructive device. His thinking was significantly distorted as a result of severe mental defect or disease, namely, schizophrenia, paranoid type, precluding the use of logical thought, normal reasoning and adequate judgment.

The psychologists noted that Carbullido did not appear to be hallucinating during his interview, but that he "clearly is delusional and has been delusional for quite some[ ]time."

The prosecution psychiatrist interviewed Carbullido "to determine the sanity at the time of the commission of the offenses." He did not offer a diagnosis but agreed that Carbullido, though competent to stand trial, did not know his acts were wrongful:

I believe James Carbullido is competent to assist counsel, aid in his defense, recall evidence reliably and to give responsible testimony if called upon to do so. At the same time, his history and the total bizarreness of his past 10 years are such that I am confident in believing he was suffering from a mental illness of psychotic proportions to the extent he did not know he was doing a wrongful act and should be considered insane at the time of the commission of the acts charged against him. I find it interesting that the structure and regulation of his time at the CCDC [Clark County Detention Center] has resulted in marked improvement and that would suggest a period in a mental institution with medication could enhance his recovery.

Carbullido appeared intelligent and responsive, described voices but did not appear to be hearing them during the interview, and stated that the voices had

---

1. The stipulation gives the date as June 6, while the present indictment gives June 5. The parties agree that both documents refer to the same incident.

diminished to "little more than a whisper and a memory" since he was arrested. He "demonstrated his competence by correctly identifying the charges against him and indicating his awareness of right and wrong and appreciation of the nature and quality of the charges against him."

On the day of trial, the prosecutor and defense counsel signed a "Joint Statement of Stipulated Facts for Purposes of 18 U.S.C. § 4242," which was drafted by the prosecutor. The stipulation quoted portions of the mental evaluations, and incorporated by reference the evaluations in full. Carbullido waived his right to a jury trial. The stipulation concluded with the following statement: "[T]he parties desire that the Court enter a verdict of not guilty by reason of insanity ... based on the stipulated factual background of the case and the diagnoses of referenced medical professionals."

Carbullido was tried before District Judge Hagen. The only witness at the brief trial was the prosecution psychiatrist who testified that Carbullido was competent to stand trial, but had not been able to understand his criminal actions:

Q    .... do you have an opinion as to his mental status presently?

A.   Well, I can only comment on the way I found him on November 16, 1999. And I felt he was competent and sane at that time.

Q.   Did you feel, then, that he at that time understood the nature and consequences of the charges against him and was able to assist his counsel?

A.   Yes, I felt that.

Q.   And did you feel that he was competent to waive a jury and proceed with a trial in the courtroom?

A.   Yes.

Q.   And do you have an opinion as to his appreciation at the time of the offense conduct in this case, whether he knew right from wrong?

A.   At that time, he did, yes.

Q.   At the time of the offense conduct, at the time he committed the offenses with which he's charged in the indictment?

A.   Probably not. Probably he was suffering from a severe psychotic condition and was responding to voices and delusions of a paranoid nature and most likely did not know right from wrong.

Q.   And at that time did he appreciate the wrongfulness of his acts?

A.   No, he did not.

Judge Hagen found that Carbullido was legally insane "at the time of the offense conduct charged," and "for a period thereafter." He thus adjudged Carbullido "not guilty only by reason of insanity." He ordered a civil commitment evaluation, report, and a hearing within 40 days pursuant to 18 U.S.C. §§ 4243, 4247(b), (c).

What then occurred were what the prosecutor characterized as "some very, very strange circumstances." The Federal Bureau of Prisons determined that Carbullido "does not currently suffer and has never suffered from a major mental illness." Its experts thought that his psychotic condition instead arose from methamphetamine use. After a lengthy competency hearing, Judge Hagen ordered Carbullido conditionally released. He noted the conflict with his findings at trial, but focused on Carbullido's present condition, the only issue properly before him at that time: "The court therefore finds that defendant has recovered from his mental disease to the extent that his conditional release under a prescribed regimen of outpatient substance dependency treatment would no longer create a substantial risk...." On appeal, the conditional release order was reversed because Carbullido had never

been committed and consequently could not have conditions imposed on his release. *United States v. Carbullido*, 251 F.3d 833 (9th Cir.2001) (per curiam).

The government immediately procured an indictment for the June 5, 1999 arson. The defense moved to dismiss on double jeopardy grounds. It is clear from the record that the parties did not anticipate any further prosecutions at the time of the stipulation and trial. At the double jeopardy hearing, defense counsel explained: "[I]f I believe[d] there was any danger of my client being charged with any of these other charges, there is no way I would have stipulated that he committed them." Similarly, the prosecutor stated: "I think all the parties thought this case was, as [defense counsel] says, going away. And but for some very, very strange circumstances unfolding, it would have...." Nonetheless, District Judge Pro affirmed the magistrate judge's recommendation and denied the motion to dismiss the indictment.

## DISCUSSION

■ The question in this case is whether the district judge's determination in the first prosecution that Carbullido was legally insane precludes a second prosecution for another act in the stipulated series. We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1291 because it derives from the protection against double jeopardy. *See Abney v. United States*, 431 U.S. 651, 659, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *United States v. Romeo*, 114 F.3d 141, 142 (9th Cir.1997).

The Supreme Court has interpreted the Fifth Amendment protection against double jeopardy to include the doctrine of collateral estoppel, or issue preclusion. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994).

The Court succinctly explained "collateral estoppel," although labeling it an awkward phrase:

> "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Ashe*, 397 U.S. at 443, 90 S.Ct. 1189.

■ We apply a three-pronged test to determine whether a prior prosecution precludes a later one: "(1) were the issues in the two cases sufficiently similar; (2) was the issue fully litigated in the first action; and (3) was the issue necessarily decided in the first action." *United States v. Stoddard*, 111 F.3d 1450, 1458 (9th Cir. 1997). The government concedes that the first prong, similarity of issues, is met, and we agree—the issues are identical. The second two prongs overlap in this case: the scope of the stipulation, roughly corresponding to the second prong (fully litigated) and the scope of the district court's finding, roughly corresponding to the third prong (necessarily decided).

■ We begin with the Supreme Court's admonition that "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Ashe*, 397 U.S. at 444, 90 S.Ct. 1189. Thus, to interpret a general verdict rendered by a jury, we "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* (quoting Daniel K. Mayers &

Fletcher L. Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 Harv. L.Rev. 1, 38–39 (1960)). In *Ashe*, the Court held that a defendant could not be tried a second time for a robbery, because the issue of his identity as the robber had previously been decided in his favor by a jury. 397 U.S. at 445–46, 90 S.Ct. 1189. He had been acquitted of robbing one participant in a poker game at a trial in which the only contested issue was identity; the state's second trial for the same robbery, but of a different victim, violated the Constitution. *Id.* at 446, 90 S.Ct. 1189.

Following *Ashe*, we have held that we must give jury verdicts the most rational interpretation possible. *Romeo*, 114 F.3d at 142–44. In *Romeo*, we held that in acquitting the defendant of possession with intent to distribute, a jury must have decided that the defendant did not know that the car he was driving contained marijuana. Although somewhat inconsistent with the jury's failure to reach a verdict on a second count, this reading attributed "less irrationality" to the jury than assuming it concluded the defendant knew he possessed it but did not intend to distribute it, because the drug quantity was high (188 pounds). *Id.* at 144; *see also Stoddard*, 111 F.3d at 1459 (holding that jury, in acquitting the defendant of a conspiracy charge, could not have believed the defendant owned money used for drug purchase yet did not agree to conspiracy or know of its aim to use the money to purchase drugs).

■ We conclude that the same practical, non-hypertechnical approach is mandated in interpreting the trial judge's findings as for interpreting a jury verdict. Indeed, in the ordinary case, it is usually easier to extract specific findings in the context of a bench trial than in the case of a general jury verdict.

■ The ultimate issue here is the scope of Judge Hagen's judgment that Carbullido was "not guilty only by reason of insanity." Such a judgment requires finding that "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). Prior to the passage of this provision, the Supreme Court had explained that "[a] verdict of not guilty by reason of insanity establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness." *Jones v. United States*, 463 U.S. 354, 363, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). This distilled explanation of an insanity verdict is useful in putting the verdict in context.

Because we recognize that mental illness is a complex phenomenon that may not map cleanly onto legal determinations, *see id.* at 365 n. 13, 103 S.Ct. 3043, we conduct an inquiry "set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Ashe*, 397 U.S. at 444, 90 S.Ct. 1189 (quoting *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948)). Thus, in this case, we look to the evidence considered by the judge in conjunction with his ruling. We also have the benefit here of confirming our conclusion through assessment of the parties' intent in the stipulation and consideration of the trial judge's own words.

We first examine the evidence to determine the most rational interpretation of the judge's ruling. Specifically, we consider whether he could rationally have found that Carbullido was legally insane when he committed the July 1998 conduct charged in the first indictment without having, in effect, made the same determination with respect to the June 1999 conduct charged

in the current indictment. Here, Judge Hagen considered the written stipulation, the expert evaluations, and the testimony of Dr. Jurasky. None of this evidence provides a basis to rationally differentiate Carbullido's mental state in committing the July 1998 act from his mental state in committing the June 1999 act. The stipulation explicitly described a course of conduct detailed by nine acts. The expert reports stated that Carbullido was suffering from a mental illness that caused him to attack Mormon properties without understanding that it was wrong. And Dr. Jurasky's testimony, particularly when taken in conjunction with his report, also so indicated. Indeed, he distinguished only Carbullido's current competency to stand trial and specifically concluded that the mental illness abated only when Carbullido went to jail.

We cannot agree with the government's suggestion that Dr. Jurasky's conclusory language stating that Carbullido was insane "at the time of the commission of the acts charged against him" limits his finding to the time of the July 1998 act, because he offered no basis for distinguishing July 1998 from the other acts. His report made clear that his conclusion was based on Carbullido's "mental illness of psychotic proportions" for the "past 10 years" until his incarceration. Based both on this report and the reports of the defense psychologists, the judge necessarily must have concluded that Carbullido's mental illness caused the stipulated conduct, charged and uncharged, and prevented his knowing that any of it was wrongful.

In the context of the judge's findings, we adopt an approach similar to that taken by a federal district court in Delaware in interpreting a jury verdict in a case remarkably similar to this one. *United States ex rel. Taylor v. Redman*, 500 F.Supp. 453 (D.Del.1980). *Redman* is the only published federal case that we have found dealing

with issue preclusion in the context of insanity. As the court observed, "The *Ashe* requirement that constitutional collateral estoppel be applied 'with realism and rationality,' precludes limiting the determination of a jury to the minimum necessary to return a verdict of not guilty under the precise terms of an indictment; consideration of the evidence is necessary." *Id.* at 457–58. There, as here, "the evidence supported a verdict of not guilty by reason of mental illness only if the jury determined that the petitioner had a long standing mental illness that gave rise to the entire series of actions...." *Id.* at 458.

On its face, the evidence in the stipulation links Carbullido's mental illness to the time frame spanning all of the arson-related events. The primary evidence in the case was the stipulation, which should be given its intended effect. *See United States v. 22 Santa Barbara Drive*, 264 F.3d 860, 873 (9th Cir.2001) (giving effect to the parties' intent and interpreting stipulation as too narrow to preclude later action). Here, the prosecutor has admitted that the government had no intention of charging Carbullido with the remaining crimes at the time of the stipulation; the defense attorney stated that she would not have signed the stipulation if she had not understood it to cover insanity for all of the stipulated acts. And, presumably, the government desired Judge Hagen to believe Carbullido to be mentally ill on a continuing basis in order to ensure his civil commitment. *See* 18 U.S.C. § 4243(e) (requiring finding of continuing dangerousness for commitment). Thus, reading the stipulation as drafted and giving the stipulation its intended effect bolsters our conclusion that the evidence supported only a finding of insanity for all of the stipulated acts.

■ Finally, we turn to Judge Hagen's statements made both in rendering the controlling judgment and in connection

with the civil commitment proceedings. We are, of course, aware that "the trial judge's characterization of his own action cannot control the classification of the action" for the purposes of double jeopardy. *Smalis v. Pennsylvania,* 476 U.S. 140, 144 n. 5, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986) (quoting *United States v. Scott,* 437 U.S. 82, 96, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) (citation omitted)). Nevertheless, the trial judge's own words give us comfort that our legal conclusion resonates with what actually occurred.

The judge found Carbullido legally insane "at the time of the offense conduct charged," and "for a period thereafter." We cannot accept the government's characterization of the latter statement as mere surplusage as it formed an integral part of the determination that Carbullido suffered from a mental illness that made him unable to understand the wrongfulness of his previous acts. *See* 18 U.S.C. § 17(a). Notably, at the hearing following Carbullido's evaluation for civil commitment, Judge Hagen interpreted his own ruling to mean that Carbullido was suffering from a continuing mental illness. Thus, the judge's own reconciliation confirms what we have already deduced from the evidence: the only rational conclusion is that the insanity finding pertained to Carbullido's insanity during all of the stipulated acts.

Because we conclude that Carbullido's legal sanity on the day of the currently charged act in June 1999 was within the scope of the issue actually litigated and necessarily decided in the prior prosecution, the second prosecution of Carbullido violates the prohibition on Double Jeopardy.

**REVERSED.**