11-2325-cr
*United States of America v. Corey Davis*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: January 30, 2013                    Decided: August 14, 2013)

Docket No. 11-2325-cr

---

UNITED STATES OF AMERICA,

*Appellee*,

v.

COREY DAVIS,

*Defendant-Appellant.*

---

Before: CABRANES, WESLEY, *Circuit Judges*, and FURMAN, *District Judge*.*

Defendant-Appellant Corey Davis appeals from the June 7, 2011 judgment of the

United States District Court for the Eastern District of New York (John Gleeson, *Judge*),

convicting him, following a jury trial, of assault resulting in serious bodily injury, in violation

of Title 18, United States Code, Section 113(a)(6).  In this opinion, we address Davis's

---

* The Honorable Jesse M. Furman, of the United States District Court for the
Southern District of New York, sitting by designation.

argument that the evidence presented at trial was insufficient to establish that the Metropolitan Detention Center, the federal prison where the crime occurred, was within the "special maritime and territorial jurisdiction of the United States" as defined in Title 18, United States Code, Section 7(3). We agree with Davis that the evidence at trial was insufficient to establish the jurisdictional element of the offense beyond a reasonable doubt, but we take judicial notice of the "legislative fact" that the Metropolitan Detention Center is within "the special maritime and territorial jurisdiction of the United States." Further, we conclude that the jury necessarily found that the assault in this case took place at the Metropolitan Detention Center. Accordingly, and for the reasons stated in a summary order filed with this opinion, we affirm Davis's conviction.

AFFIRMED.

> TINA SCHNEIDER, Law Office of Tina Schneider, Portland, ME, *for Defendant-Appellant Corey Davis*.
>
> AMIR H. TOOSSI, Assistant United States Attorney (Emily Berger, Assistant United States Attorney, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY.

JESSE M. FURMAN, *District Judge*:

Defendant-Appellant Corey Davis appeals from a June 7, 2011 judgment of the United States District Court for the Eastern District of New York (John Gleeson, *Judge*), convicting him, following a jury trial, of committing an assault resulting in serious bodily injury, in violation of Title 18, United States Code, Section 113(a)(6). Davis raises various claims on appeal, most of which we reject in a summary order filed today. In this opinion, we address Davis's most substantial argument: that the evidence was insufficient to prove

that the Metropolitan Detention Center ("MDC") — a federal prison in Brooklyn, New York, where the assault took place — was within "the special maritime and territorial jurisdiction of the United States." We agree with Davis that the Government failed to present sufficient evidence on this point at trial. Nevertheless, we affirm the judgment of the district court because we find that the jurisdictional status of the MDC is a "legislative fact" of which we may take judicial notice.

## BACKGROUND

On May 8, 2009, while he was incarcerated at the MDC, Davis struck fellow inmate Robert Wright four times in the face, breaking Wright's jaw. As a result of this incident, a grand jury in the Eastern District of New York returned an indictment charging Davis with one count of committing an assault resulting in serious bodily injury, in violation of Title 18, United States Code, Section 113(a)(6). That Section provides that "[w]hoever, *within the special maritime and territorial jurisdiction of the United States*," commits an "[a]ssault resulting in serious bodily injury" shall be punished by a fine or up to ten years' imprisonment, or both. 18 U.S.C. § 113(a)(6) (emphasis added). To find a defendant guilty of violating Section 113(a)(6), therefore, the Government must prove, and the jury must find, three elements beyond a reasonable doubt: first, that the defendant assaulted another person by intentionally striking him; second, that, as a result, the other person suffered serious bodily injury; and third, that the assault took place within the special maritime and territorial

3

jurisdiction of the United States. *See id.*; *see also United States v. Loera*, 923 F.2d 725, 727-28 (9th Cir. 1991).[1] This appeal concerns the third element.

Title 18, United States Code, Section 7 defines the "special maritime and territorial jurisdiction of the United States." To the extent relevant here, it includes the following:

> Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

18 U.S.C. § 7(3). At trial, the only proof that the MDC fell within that definition was the testimony of Federal Bureau of Prisons ("BOP") employees assigned to the MDC. Most notably, Steven Rivera, a Special Investigative Technician, testified that the MDC is "a federal prison" that is "on federal land." Transcript of the Trial of Corey Davis (Nov. 9, 2010) ("Trial Tr.") at 21. On cross examination, however, Rivera acknowledged that he did not "know what year [the] land was obtained from the [New York] state government," did not "know how the federal government accepted jurisdiction," and did not "know when New York State agreed to the transfer." *Id.* at 37. He further testified that, aside from working for the BOP at the MDC, he had "no other basis for knowing it's federal land." *Id.*

After the Government rested its case, Davis moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Among other things, Davis argued that the evidence presented at trial was insufficient to sustain a conviction because

---

[1] Section 113 was amended on September 13, 1994. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796. The amendment recodified Section 113(a) as Section 113(a)(1) and Section 113(f) as Section 113(a)(6), but made no other changes relevant to this case.

the Government had failed to establish beyond a reasonable doubt that the assault had occurred within the special maritime and territorial jurisdiction of the United States. *Id.* at 188-90. In opposing the motion, the Government argued that the jury could find from the evidence that the MDC was a federal prison on federal land and that was "[all] that's necessary" to satisfy the jurisdictional element of Section 113(a)(6). *Id.* at 191-92. Citing *United States v. Hernandez-Fundora*, 58 F.3d 802 (2d Cir. 1995), in which this Court found that the testimony of an FBI agent regarding the jurisdictional status of a federal correctional facility was sufficient to satisfy that element, the district court denied Davis's motion in a ruling from the bench. *Id.* at 196, 198.

The district court then turned to the jury instructions. Davis asked the district court to instruct the jury that it must find that the assault occurred within the special maritime and territorial jurisdiction of the United States and to define that term by quoting Section 7(3). Additionally, Davis asked the district court not to take judicial notice that the MDC was within the special maritime and territorial jurisdiction of the United States, but to leave that issue for the jury to decide. *Id.* at 199-203. By contrast, the Government argued that, in light of *Hernandez-Fundora*, the district court should instruct the jury that the jurisdictional element was satisfied if it found that the crime occurred in a federal prison. *Id.* at 201. The district court granted Davis's request not "to take judicial notice of anything," stating that it "shouldn't take the issue about the MDC being the sort of the property that establishes the jurisdictional element from the jury." *Id.* at 210. Nevertheless, the district court declined to give the instruction requested by Davis, concluding that "the testimony of Rivera about it being a federal prison on federal land does the trick if believed by the jury." *Id.* Thus, the

5

district court explained that it would tell the jury that the Government "may establish" the jurisdictional element "by proving that the alleged assault occurred in a federal prison on federal land." *Id.* at 266.

In summation, the Government therefore argued — over an objection by Davis — that the jurisdictional element of the crime had been satisfied by the testimony of Rivera that the MDC is "a federal prison . . . on federal land." *Id.* at 213. Davis, on the other hand, argued that the jurisdictional element had not been met because the Government had failed to prove that the MDC was on federal land: "[T]he government has to show that the jail was on federal land. They can't just say it's a federal prison. It must have been on federal land. . . . And just because someone works at a federal facility doesn't mean it was on federal land." *Id.* at 247. In rebuttal, the Government acknowledged that it had not presented any "maps or charts or deeds," but cited the testimony of Rivera and the other BOP employees that the MDC was a federal prison. *Id.* at 250. "When you're in a federal post office," the Government contended, "you're on federal land. When you're in a federal courthouse, you are on federal land, and when you are in a federal prison, you are on federal land. You can infer that from the testimony that you have." *Id.*

Consistent with its ruling at the charge conference, the district court then instructed the jury that, to convict Davis, it had to find beyond a reasonable doubt

> that the assault occurred . . . within the special maritime and territorial jurisdiction of the United States, meaning in this context any land reserved or acquired for the use of the United States and under its exclusive or concurrent jurisdiction. *The government may establish this element by proving that the alleged assault occurred in a federal prison on federal land.*

6

*Id.* at 266 (emphasis added). Thereafter, the jury returned a general verdict convicting Davis of assault resulting in serious bodily injury, in violation of Section 113(a)(6).

On January 25, 2011, represented by new counsel, Davis moved for a judgment of acquittal or a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, arguing once again that the evidence was insufficient to establish the jurisdictional element of the crime. At sentencing on June 3, 2011, the district court denied the motion from the bench, concluding that Davis's case was indistinguishable from *Hernandez-Fundora.* As the district court explained:

> The [*Hernandez-Fundora*] court held that where a competent witness testifies that an incident occurred in a location where the federal government exercises jurisdiction and that testimony remains uncontradicted, the jury can find jurisdiction beyond a reasonable doubt. . . . The only distinction between this case and *Hernandez-Fundora* is that the agent there testified that the criminal act took place in the federal prison that was under concurrent jurisdiction, while in this case Rivera testified that the act took place in a federal prison on federal land. I don't find that distinction significant. The Circuit in *Hernandez-Fundora* presumed that the agent's testimony regarding concurrent jurisdiction was presumably based, among other things, on the "[c]ommonplace knowledge that a federal prison is likely to be a location where federal jurisdiction is at least concurrently exercised." . . . The agent could draw an inference that federal jurisdiction existed from the fact that he actually had knowledge that the incident occurred in a federal prison, and the jury in this case could draw the same inference.

Transcript of the Sentencing of Corey Davis (June 3, 2011) at 4-5 (quoting *Hernandez-Fundora*, 58 F.3d at 809). The district court then sentenced Davis to sixty months' imprisonment, to be served consecutively to the sentence he was serving when the assault occurred and to be followed by three years' supervised release, and imposed a $100 special assessment. Judgment was entered on June 7, 2011. This appeal followed.

7

## DISCUSSION

### A. Sufficiency of the Evidence at Trial

The first question on appeal is whether the evidence at trial — namely, witness testimony that the MDC is a "federal prison" on "federal land" — was sufficient to satisfy the jurisdictional element of Davis's offense of conviction. That question, in turn, requires an understanding of the nature of federal jurisdiction over lands acquired from a state.

The power of the federal government to *acquire* land within a state, either by purchase or condemnation, is "well established." *Paul v. United States*, 371 U.S. 245, 264 (1963). In general, there are two ways that the United States can also obtain jurisdiction over such land within a state: consent and cession. *See, e.g.*, *Kleppe v. New Mexico*, 426 U.S. 529, 542-43 (1976).[2] The first method, consent, arises from Article I, Section 8, Clause 17 of the Constitution, the so-called Enclave Clause, which provides that Congress has the power

> [t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia], . . . and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const., art. I, § 8, cl. 17; *see also James v. Dravo Contracting Co.*, 302 U.S. 134, 141 (1937) (explaining that "exclusive legislation" means "exclusive jurisdiction"). Until the twentieth century, the prevailing view was that "[w]hen the title is acquired by purchase by consent of the legislatures of the states, the federal jurisdiction is exclusive of all state authority." *Fort Leavenworth*, 114 U.S. at 532. In 1937, however, the Supreme Court made clear that "a State

---

[2] A third method, irrelevant here, involves the reservation of federal jurisdiction over federal land within a state at the time the state is admitted to the Union. *See, e.g.*, *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 526-27 (1885).

may condition its 'consent' upon its retention of jurisdiction over the lands consistent with the federal use," in which case federal jurisdiction is concurrent rather than exclusive. *Paul*, 371 U.S. at 265 (citing *Dravo Contracting*, 302 U.S. at 146-49).

The second method, cession, was recognized by the Supreme Court in *Fort Leavenworth Railway Co. v. Lowe*, 114 U.S. 525 (1885). That case involved the Fort Leavenworth Military Reservation, which had been under the exclusive jurisdiction of the United States until Kansas was admitted to the Union in 1861. *See id.* at 526. In 1875, the Kansas state legislature passed an act ceding jurisdiction over the property to the federal government, but reserving to Kansas the right "to tax railroad, bridge, and other corporations, their franchises and property . . . ." *Id.* at 528. The Supreme Court upheld this reservation of jurisdiction, holding that because the federal government had not purchased Fort Leavenworth, the state had authority to reserve for itself any jurisdiction that did not conflict with the federal use of the property. *See id.* at 539. In so holding, the Court established that the Enclave Clause "is not the sole authority for the acquisition of jurisdiction. There is no question about the power of the United States to exercise jurisdiction secured by cession, though this is not provided for by clause 17." *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 529 (1938) (citing *Fort Leavenworth* and other cases); *accord Kleppe*, 426 U.S. at 542; *Paul*, 371 U.S. at 264.

Significantly, under either method, the state must agree to the transfer of jurisdiction for it to be valid. *See, e.g.*, *United States v. Johnson*, 994 F.2d 980, 984 (2d Cir. 1993) (citing *Paul*, 371 U.S. at 264). In addition, the federal government itself must accept jurisdiction. *See, e.g.*, *Adams v. United States*, 319 U.S. 312, 314-15 (1943); *Johnson*, 994 F.2d at 984. Until 1940,

9

"acceptance of jurisdiction over lands acquired by the United States was presumed in the absence of evidence to the contrary." *United States v. Cassidy*, 571 F.2d 534, 536 (10th Cir. 1978) (citing *Atkinson v. Tax Comm'n*, 303 U.S. 20, 23 (1938); *Silas Mason Co. v. Tax Comm'n*, 302 U.S. 186, 207 (1937)); *see also United States v. Gabrion*, 517 F.3d 839, 848 (6th Cir. 2008). In 1940, however, Congress enacted legislation providing that, "[u]nless and until the United States has accepted jurisdiction over lands hereafter to be acquired . . . , it shall be conclusively presumed that no such jurisdiction has been accepted." *Johnson*, 994 F.2d at 984-85 (citing 40 U.S.C. § 3112 (formerly 40 U.S.C. § 255)). Accordingly, "[a]s to lands acquired by the United States after 1940, it has been held that the United States does not acquire jurisdiction over lands acquired by it unless it gives notice of acceptance." *Cassidy*, 571 F.2d at 536-37 (citing *Adams*, 319 U.S. 312).

The upshot of all this is that the United States does not have jurisdiction over all lands owned by the federal government within the states. In the absence of the state's consent or a cession of jurisdiction, and, since 1940, in the absence of an explicit acceptance of jurisdiction by the federal government, the federal government's possession is "simply that of an ordinary proprietor." *Paul*, 371 U.S. at 264 (citing *Dravo Contracting*, 302 U.S. at 141-42); *accord Johnson*, 994 F.2d at 984.[3] Applying these principles, the Supreme Court and

---

[3] To be sure, the federal government's possession of land is never really that of an "ordinary proprietor" insofar as Congress has power to enact legislation respecting federal lands pursuant to the Property and Territory Clause of the Constitution, which authorizes Congress "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2; *see Kleppe*, 426 U.S. at 543. "And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." *Kleppe*, 426 U.S. at 543 (citing U.S. Const. art. VI, § 3, cl. 2). In this case, however, the Government does not contend that Congress's power to enact legislation pursuant to the Property and Territory Clause alone

other courts have held in various cases that the federal government lacked jurisdiction over certain federal military installations, post offices, and hospitals, even though they were on federal land. *See, e.g.*, *Adams*, 319 U.S. at 313-15 (federal military camp); *United States ex rel. Greer v. Pate*, 393 F.2d 44, 45-47 (7th Cir. 1968) (post office); *DeKalb Cnty., Georgia v. Henry C. Beck Co.*, 382 F.2d 992, 994-96 (5th Cir. 1967) (Veterans Administration hospital); *United States v. Williams*, 17 M.J. 207, 211, 215 (Ct. Mil. App. 1984) (federal military base). This led one court to state that, "[a]lthough some may assume" that federal installations of these sorts "automatically come[ ] within Federal jurisdiction, that assumption is incorrect." *Williams*, 17 M.J. at 211; *see also, e.g.*, William M. Carter, Jr., *"Trust Me, I'm a Judge": Why Binding Judicial Notice of Jurisdictional Facts Violates the Right to Jury Trial*, 68 Mo. L. Rev. 649, 659-60 (2003) ("[T]he mere fact that the federal government owns or makes use of a parcel of land is not sufficient to establish federal jurisdiction over that land.").

It follows that the evidence at trial in this case was not sufficient to satisfy the jurisdictional element of the offense of conviction. That is, even viewing "the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (internal citations, alterations, and quotation marks omitted), the proof at trial was not sufficient to find beyond a reasonable doubt that the MDC was within the special maritime and territorial jurisdiction of the United States. Put simply, the mere fact that the

would suffice to bring land within the special maritime and territorial jurisdiction of the United States.

11

assault took place in a federal prison on federal land — the full extent of the evidence that the Government presented on the jurisdictional question — does not mean that the federal government had jurisdiction over the location of the assault. And, contrary to what the district court told the jury, the Government could not satisfy the jurisdictional element of the offense simply "by proving that the alleged assault occurred in a federal prison on federal land." Trial Tr. at 266.

Our decision in *Hernandez-Fundora*, upon which the district court relied below and the Government relies on appeal, is consistent with this conclusion. That case, also involving an inmate-on-inmate assault in violation of Section 113(a)(6), concerned the jurisdictional status of Raybrook Federal Correctional Institution ("Raybrook"), in the Northern District of New York. *See* 58 F.3d at 804-05. The sole evidence at trial on whether Raybrook was within the special maritime and territorial jurisdiction of the United States came from an FBI agent, who testified — over a hearsay objection — that Raybrook was "federal property" and that it was "under concurrent jurisdiction; the Federal Government has a deed to the property, and both the Federal Government and State Government have concurrent jurisdiction." *Id.* at 808. In addition, the district court took judicial notice that Raybrook fell within the special maritime and territorial jurisdiction of the United States, and therefore instructed the jury that if it found "beyond a reasonable doubt that the acted [sic] alleged occurred at [Raybrook]," the jurisdictional element of the offense had been met. *Id.* at 809 (alterations in original). On appeal, the defendant argued both that the jurisdictional element was "not supported by legally sufficient evidence (which was improperly admitted)," and that the element was "improperly removed from the jury." *Id.* at 804.

12

Although we vacated the conviction and remanded for resentencing, we rejected the defendant's jurisdictional arguments. First, with respect to the sufficiency of the evidence, we held that the agent's uncontradicted testimony was sufficient to satisfy the jurisdictional element and that the Government was not required to admit the actual deed of transfer from the state to the federal government. *See id.* at 808-09. We also concluded that the defendant's hearsay objection to the agent's testimony did "not withstand analysis." *Id.* at 809. The agent, we explained, "was not essentially testifying as to the substance of the out-of-court 'statement,' represented by the deed that established concurrent federal jurisdiction over Raybrook. Rather, he was testifying to an overall conclusion that Raybrook was 'under concurrent jurisdiction.'" *Id.* (citation omitted). The agent's testimony, we reasoned further, "was presumably based, *inter alia*, upon the commonplace knowledge that a federal prison is likely to be a location where federal jurisdiction is at least concurrently exercised." *Id.*

Second, we concluded that the district court had properly removed the question of Raybrook's jurisdictional status from the jury. *See id.* at 809-12. Relying on *United States v. Cook*, 922 F.2d 1026 (2d Cir. 1991), and *United States v. Jones*, 480 F.2d 1135 (2d Cir. 1973), we held that the district court "correctly left the *factual* element — the locus of the crime — to the jury, while reserving the *question of law* — whether the federal government had accepted jurisdiction — to itself." 58 F.3d at 810 (emphasis added). Additionally, we held that the district court's instruction did not violate Rule 201 of the Federal Rules of Evidence, which mandates that the court in a criminal case "instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed." *Id.* at 810 (quoting Fed. R.

13

Evid. 201(g)).[4]  By its terms, we reasoned, Rule 201 applies only to "adjudicative facts,"
which are "those developed in a particular case," and does not apply to "legislative facts,"
which are "established truths, facts or pronouncements that do not change from case to case
but apply universally."  *Id.* at 812 (quoting *United States v. Gould*, 536 F.2d 216, 220 (8th Cir.
1976)).  The jurisdictional status of Raybrook, we concluded, was "premised upon a
determination of legislative, rather than adjudicative, facts to which Rule 201 . . . [was]
inapplicable."  *Id.* at 812.  Accordingly, "the district court was entitled to determine that
Raybrook [fell] within the special maritime and territorial jurisdiction of the United States,
and to remove that issue from consideration by the jury."  *Id.*

There are two critical differences between *Hernandez-Fundora* and this case.  First, as
noted, the district court in *Hernandez-Fundora* took judicial notice that Raybrook was within
the special maritime and territorial jurisdiction of the United States (as it turns out, for
reasons discussed below, inappropriately).  Here, by contrast, the district court expressly
refused "to take judicial notice of anything."  Second, the evidence in *Hernandez-Fundora*
included testimony that the federal government had "concurrent jurisdiction" over
Raybrook.  Here, by contrast, there was no evidence regarding federal jurisdiction over the
MDC; instead, the only relevant evidence was testimony that the MDC was a "federal
prison" on "federal land."  Given the legal principles discussed above, our observation in
*Hernandez-Fundora* that the agent's "testimony was presumably based, *inter alia*, upon the
commonplace knowledge that a federal prison is *likely* to be a location where federal
jurisdiction is at least concurrently exercised," 58 F.3d at 809 (emphasis added) — an

_____

4       Rule 201(g) is now Rule 201(f).

14

observation made in reference to whether the agent's testimony was hearsay, not whether it was sufficient proof — cannot be read to suggest that the evidence here was sufficient to prove the jurisdictional element *beyond a reasonable doubt*.

If anything, the subsequent history of *Hernandez-Fundora* underscores the insufficiency of the evidence in this case. On remand for resentencing, the district court vacated the defendant's conviction and dismissed the indictment after the Government discovered that — contrary to the agent's testimony at trial — the federal government did not in fact have jurisdiction, concurrent or otherwise, over Raybrook. That is to say, it turned out that, although Raybrook was indisputably a "federal prison" on "federal land," the federal government did not exercise jurisdiction over the land and it did not fall within the special maritime and territorial jurisdiction of the United States.[5] That history provides a cautionary tale to the Government and district courts alike: One cannot simply assume that a federal installation on federal land "automatically comes within Federal jurisdiction." *Williams*, 17 M.J. at 211. Yet that is precisely what the Government and the district court did in this case.

## B. Taking Judicial Notice on Appeal

Generally, where we conclude on appeal that the evidence presented at trial was insufficient to satisfy an essential element of the offense of conviction, we reverse the judgment of conviction, and that is the end of the matter. *See, e.g.*, *United States v. Litwok*, 678

---

[5] According to the Government, New York never ceded jurisdiction over the land on which Raybrook sat to the federal government. Gov't Supp. Letter (Feb. 8, 2013) 4. Further, at the time of the purchase (in 1978, when the presumption *against* acceptance of jurisdiction by the federal government applied), New York expressly withheld its consent to purchases of land within the Adirondack park, where Raybrook was situated. *Id.* (citing Laws of New York, 1981, Ch. 593).

F.3d 208, 216 (2d Cir. 2012). That is not the end of the matter here, however, as the Government argues that we can and should take judicial notice on appeal of the fact that the MDC falls within the special maritime and territorial jurisdiction of the United States. Gov't Br. 15-16. We agree.

As an initial matter, the propriety of this Court taking judicial notice of the jurisdictional status of the MDC is all but settled by *Hernandez-Fundora*. As noted above, we held in that case that whether a particular plot of land falls within the special maritime and territorial jurisdiction of the United States is a "legislative fact" that may be judicially noticed without being subject to the strictures of Rule 201. *See* 58 F.3d at 809-12.[6] To be sure, we did not address the question of whether *this* Court could take judicial notice of such a fact for the first time on appeal, as the district court in that case had done so itself. We did, however, cite favorably three cases in which other courts of appeals took judicial notice of federal jurisdiction over particular lands even "where the prosecution [had] not offered direct evidence on the issue." *Id.* at 811 (citing *United States v. Lavender*, 602 F.2d 639, 641 (4th Cir. 1979); *Gov't of Canal Zone v. Burjan*, 596 F.2d 690, 693-95 (5th Cir. 1979); *United States v. Hughes*, 542 F.2d 246, 248 n.1 (5th Cir. 1976)). And since *Hernandez-Fundora*, we have observed that "appellate courts take judicial notice of legislative facts under appropriate circumstances," especially where they relate to "straightforward questions" such as "geography and jurisdiction." *Landell v. Sorrell*, 382 F.3d 91, 135 n.24 (2d Cir. 2002) (citing

---

[6] The First Circuit, by contrast, considers the question of whether a geographic location is within the special maritime and territorial jurisdiction of the United States to be an "adjudicative" fact subject to Federal Rule of Evidence 201. *See United States v. Bello*, 194 F.3d 18, 23-25 (1st Cir. 1999).

16

*Hernandez-Fundora*, 58 F.3d at 812), *rev'd on other grounds*, 548 U.S. 230 (2006); *see also Mills v. Denver Tramway Corp.*, 155 F.2d 808, 812 (10th Cir. 1946) (holding that the trial court's failure to take judicial notice of a fact did not preclude a party from raising the issue for the first time on appeal or prevent the appellate court from noticing the fact on its own accord).

Davis implicitly concedes that *Hernandez-Fundora* stands for the proposition that we may take judicial notice of whether or not the MDC is within the special maritime and territorial jurisdiction of the United States for the first time on appeal. *See* Appellant Reply Br. 9. He argues, however, that we should "reevaluate and abrogate" that aspect of *Hernandez-Fundora* on the ground that it was "implicitly overruled" by the Supreme Court's recent Sixth Amendment jurisprudence associated with *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Appellant Reply Br. 9-10. But Davis cites no authority for the proposition that *Apprendi* and its progeny cast into doubt decisions about whether, and when, a court may take judicial notice of a legislative fact, and — one piece of academic commentary aside, *see* Carter, *supra*, at 652-58 — we have found no such authority ourselves. To the contrary, the Fifth Circuit has expressly held (albeit in an unpublished summary order) that *Apprendi* "had no effect on whether [a court] could take judicial notice of the [jurisdictional] status" of a particular piece of land. *United States v. Styles*, 75 F. App'x 934, 935 (5th Cir. Sept. 17, 2003) (unpublished). And, although it did not cite *Apprendi* or its progeny, the Seventh Circuit has likewise held (also in an unpublished summary order) that taking judicial notice of the "legislative fact" of whether a place is within a particular federal district does not violate the

17

Sixth Amendment right to jury trial. *See United States v. Arroyo*, 310 F. App'x 928, 929 (7th Cir. Feb. 26, 2009) (unpublished).[7]

We agree. As *Hernandez-Fundora* makes clear, to determine whether a crime took place within the special maritime and territorial jurisdiction of the United States requires two separate inquiries: one to determine the "locus of the crime" and one to determine the existence *vel non* of federal jurisdiction. *See* 58 F.3d at 810. While the former is plainly a factual question for the jury to decide, the latter — turning on a fixed legal status that does not change from case to case and involving consideration of source materials (such as deeds, statutes, and treaties) that judges are better suited to evaluate than juries — has always been treated in this Circuit as a legal question that a court may decide on its own. *See id.* (citing *Jones*, 480 F.2d at 1138; *Cook*, 922 F.2d at 1031); *see also United States v. Warren*, 984 F.2d 325, 327 (9th Cir. 1993) (holding that the existence of federal jurisdiction over a geographic area is a legal question, while the locus of the offense within that area is a factual question for the jury); *cf. Miller v. Fenton*, 474 U.S. 104, 114 (1985) ("[T]he fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question."). Nothing in *Apprendi* or its progeny called this distinction into question, let alone suggested that questions of law must be submitted to the jury under the Sixth Amendment. Accordingly,

---

[7] By contrast, there is authority for the proposition that taking judicial notice of an "adjudicative" fact — that is, a fact "developed in a particular case," *Hernandez-Fundora*, 58 F.3d at 812 — after the jury's discharge in a criminal case would violate the Sixth Amendment right to trial by jury. *See, e.g.*, *United States v. Zepeda*, 705 F.3d 1052, 1064 (9th Cir. 2013).

18

we remain bound by *Hernandez-Fundora*. *See, e.g.*, *Consol. Edison Co. v. UGI Util. Inc.*, 423 F.3d 90, 101 n.12 (2d Cir. 2005) ("Generally, this court is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court *en banc*." (internal quotation marks omitted)).

## C. The Jurisdictional Status of the MDC

Having concluded that we may take judicial notice on appeal of whether a particular piece of land falls within the special maritime and territorial jurisdiction of the United States, we turn to address the jurisdictional status of the MDC. As Davis concedes, documents submitted by the Government show that the United States purchased the land on which the MDC now sits from the Bush Terminal Building Company on October 18, 1918, originally for use as a United States Navy depot. *See* Appellant Reply Br. 12. At the time of this purchase, Section 50 of the Consolidated Laws of New York provided as follows:

> The consent of the state of New York is hereby given to the purchase by the government of the United States, and under the authority of the same, of any tract, piece or parcel of land from any individual or individuals, bodies politic or corporate within the boundaries of this state, for the purpose of . . . navy yards . . . or buildings and structures for the storage, manufacture or production of supplies, ordinance, apparatus or equipment of any kind whatsoever for the use of the army or navy, and all deeds, conveyances or other papers relating to the title thereof shall be recorded in the office of the register, if any, or if not in the office of the county clerk, of the county where the said lands are situated.

Laws of New York, 1917, Chap. 819 (amending Consol. Laws N.Y. 1909, Art. 4 § 50). In 1922, the New York legislature extended the reach of Section 50 to include land purchased by the United States for the purpose of "any other needful building." Laws of New York, 1922, Chap. 14. The Navy continued to use the land until 1993, when it was transferred to the BOP to become the MDC.

19

In light of this history, we find as a matter of law that the MDC is indeed within the special maritime and territorial jurisdiction of the United States. In particular, all of the conditions necessary for the federal government to obtain jurisdiction over the land were met: The federal government purchased the land for use by the Navy with the consent of New York, as reflected in Section 50. *See, e.g.*, *United States v. State Tax Comm'n of Miss.*, 412 U.S. 363, 372 n.15 (1973) (noting that consent may be in the form of a general consent statute or consent to a particular acquisition). And, as Davis concedes, because the purchase took place prior to 1940, acceptance of jurisdiction by the federal government is presumed absent evidence to the contrary, of which there is none in this case. Appellant Reply Br. 12 n.4; *see Cassidy*, 571 F.2d at 536; *see also Markham v. United States*, 215 F.2d 56, 58 (4th Cir. 1954) (presuming acceptance of jurisdiction over land acquired in 1919). The fact that the federal government changed its use of the land in 1993 makes no difference to the analysis or conclusion, as New York extended the terms of its consent long before that date to encompass "any other needful building," and the MDC plainly qualifies as such. *See, e.g.*, *Silas Mason*, 302 U.S. at 203 (noting that the phrase "other needful Buildings" in the Enclave Clause includes "whatever structures are found to be necessary in the performance of the functions of the Federal Government"); *see also Paul*, 371 U.S. at 264 (explaining that if land is acquired without state consent and the state gives "its 'consent'" later, the federal government still obtains jurisdiction).

In arguing otherwise, Davis cites two other provisions of New York law. The first, Section 52 of the Consolidated Laws of New York, provided as follows in 1918, when the United States purchased the land at issue in this case:

20

> Whenever the United States, by any agent authorized under the hand and seal of any head of an executive department of the government of the United States, shall cause to be filed and recorded in the office of the secretary of state of the state of New York, certified copies of the record or transfer to the United States of any tracts or parcels of land within this state, which have been acquired by the United States for any of the purposes aforesaid, together with maps or plats and descriptions of such lands by metes and bounds, and a certificate of the attorney-general of the United States that the United States is in possession of said lands and premises for either of the works or purposes aforesaid, under a clear and complete title, the governor of this state is authorized, if he deems it proper, to execute in duplicate, in the name of the state and under its great seal, a deed or release of the state ceding to the United States the jurisdiction of said tracts or parcels of land as hereinafter provided.

Consol. Laws N.Y. 1909, Art. 4 § 52. The second, Section 55, stated that "said deed or release shall become valid and effectual only upon such filing and recording" with the New York Secretary of State. *Id.* § 55. Davis argues that, while Section 50 provided New York's consent to the purchase of the land, Sections 52 and 55 placed certain conditions on that consent — namely, that jurisdiction would not be ceded unless and until the Governor filed the deed or release with the Secretary of State — and that those conditions were not met in this case. Appellant Reply Br. 14-16; Appellant Supp. Br. 1-8.

This argument is unavailing. By their plain terms, Sections 52 and 55 govern the second method by which the federal government can obtain jurisdiction over a given plot of land: cession. *See* Consol. Laws N.Y. 1909, Art. 4 § 52 (authorizing the Governor "to execute . . . a deed or release of the state *ceding* to the United States the jurisdiction of said tracts or parcels of land") (emphasis added)). Where, as here, the federal government purchases land with the consent of the state for "the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings," no other action is required for the United States to obtain jurisdiction over the land. U.S. Const., art. I, § 8, cl. 17. To be sure, "a State may

21

condition its 'consent' upon its retention of jurisdiction over the lands consistent with the federal use," but even if it does so, that does not deprive the federal government of jurisdiction over the land for purposes of Section 7(3); it merely means that federal jurisdiction is concurrent rather than exclusive. *Paul*, 371 U.S. at 265 (citing *Dravo Contracting*, 302 U.S. at 146-49). At most, therefore, if the conditions in Sections 52 and 55 were never met, as Davis alleges, it would mean that New York never ceded its *own* jurisdiction over the land on which the MDC sits — a proposition that we need not entertain today. *See, e.g.*, *People v. Vendome Serv., Inc.*, 19 N.Y.S.2d 195, 196-97 (N.Y. Sp. Sess.) (holding that "unless and until said Section 52 has in all respects been complied with and its requirements completely met[,] the United States Government cannot be said to exercise jurisdiction over property acquired under sections 50 and 51 *to the partial or total exclusion of the State of New York*" (emphasis added)), *aff'd*, 284 N.Y. 742 (N.Y. 1940). Even if New York does retain jurisdiction over the land on which the MDC sits, the property would still be subject to federal jurisdiction for purposes of Section 7(3).

**D. The Locus of the Crime**

Even that does not end the analysis, however, as we must determine whether the jury's general verdict in this case encompassed a finding that Davis's crime occurred at the MDC. Such a finding is necessary because, as noted above, the locus of the crime is a factual element of the offense that must be determined by the jury beyond a reasonable doubt. *See Hernandez-Fundora*, 58 F.3d at 811.

Although we have not encountered this precise question before, we have had occasion to address whether and when a court can infer from a general verdict that the jury

22

made certain subsidiary factual findings. Specifically, in cases before and after *Apprendi*, we have held that a court may look at the record, including the indictment, the evidence at trial, the jury charge, summations, and other relevant matter, to determine what the jury "necessarily decided" in returning a general verdict. *United States v. Zillgitt*, 286 F.3d 128, 138 (2d Cir. 2002); *accord United States v. Barnes*, 158 F.3d 662, 668 (2d Cir. 1998); *see also United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006) (rejecting the argument that it was "impossible to determine which of two competing theories formed the basis for conviction" of securities fraud charges in light of the jury instructions, evidence presented at trial, and government's summation); *cf. United States v. Carbullido*, 307 F.3d 957, 961 (9th Cir. 2002) (explaining that to interpret a general verdict for purposes of collateral estoppel review in a criminal case, an appellate court "examine[s] the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude[s] whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration" (internal quotation marks omitted)).

Looking at those sources here, there is no doubt whatsoever that the jury found that Davis's assault took place at the MDC. Given the district court's charge, there is no way the jury could have convicted Davis, as it did, without finding that assault "occurred in a federal prison on federal land." And there was no dispute at trial that Davis was incarcerated at the MDC on the date in question and that all relevant events — captured on videotape of the prison — took place there. It follows that the jury necessarily found that the assault occurred at the MDC. That finding, coupled with this Court's taking of judicial notice that

23

the MDC is within the special maritime and territorial jurisdiction of the United States, is

sufficient to affirm Davis's conviction.

## CONCLUSION

In sum, we conclude as follows:

(1) The evidence presented at trial by the Government was insufficient to support a finding, beyond a reasonable doubt, that the MDC was within the special maritime and territorial jurisdiction of the United States as defined in Title 18, United States Code, Section 7(3);

(2) The district court erred when it instructed the jury that the Government could satisfy the jurisdictional element of the offense merely "by proving that the alleged assault occurred in a federal prison on federal land";

(3) We may take judicial notice on appeal of the "legislative fact" that the MDC falls within the special maritime and territorial jurisdiction of the United States without violating the Sixth Amendment right to jury trial;

(4) The MDC is indeed within the special maritime and territorial jurisdiction of the United States, as the federal government purchased the land on which the facility sits with the consent of the New York state legislature; and

(5) The jury's general verdict in this case necessarily encompassed a finding that the assault occurred at the MDC.

Accordingly, and for the reasons set forth in the accompanying summary order, we

**AFFIRM** the judgment of the district court.

Lest there be any misunderstanding, by affirming we do not mean to suggest that we

approve of how this case was handled by or before the district court. We have observed that

"[t]here is nothing more crucial, yet so strikingly obvious, as the need to prove the

jurisdictional element of a crime." *United States v. Leslie*, 103 F.3d 1093, 1103 (2d Cir. 1997).

In this case, however, the Government gave short shrift to that element. That carelessness is

even more notable because, given our decision in *Hernandez-Fundora*, the Government's task

24

in proving the jurisdictional element — despite the district court's somewhat inexplicable refusal to entertain the possibility of taking judicial notice — was not especially difficult. The Government did not need to present evidence beyond competent witness testimony; it merely needed to ensure that it elicited sufficient testimony to prove the element beyond a reasonable doubt.  Its failure to do so not only made our task on appeal considerably more difficult, but it also imperiled an otherwise safe conviction for a serious offense.